UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| RODNEY M. SAMUELSON, M.D., | ) | Case No.  23-5091 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **COMPLAINT** |
| MONUMENT HEALTH, INC. F/K/A | ) | |
| REGIONAL HEALTH, INC., MONUMENT | ) | **(TRIAL BY JURY REQUESTED)** |
| HEALTH PHYSICIANS, INC., F/K/A | ) | |
| REGIONAL HEALTH PHYSICIANS, INC., and | ) | |
| MONUMENT HEALTH RAPID CITY | ) | |
| HOSPITAL, INC. F/K/A RAPID CITY | ) | |
| REGIONAL HOSPITAL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

COMES NOW Plaintiff Rodney M. Samuelson, M.D., by and through his counsel of record, Sara Frankenstein of Gunderson, Palmer, Nelson & Ashmore, LLP and for his causes of action against Monument Health, Inc. f/k/a Regional Health, Inc., Monument Health Physicians, Inc., f/k/a Regional Health Physicians, Inc., and Monument Health Rapid City Hospital, Inc. f/k/a Rapid City Regional Hospital, Inc. (hereinafter "Monument Health"), does hereby state and allege as follows:

## I.    JURISDICTION AND VENUE

1.    Plaintiff Rodney M. Samuelson, M.D. (hereinafter "Dr. Samuelson") invokes the jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) and 42 U.S.C. §§ 12101-12213.  This is an action authorized and instituted pursuant to the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, et seq. (hereinafter "ADA").

2.	Venue herein is proper under 28 U.S.C. § 1391(b). The unlawful employment practices alleged herein were committed in Pennington County, South Dakota, in the Western District of South Dakota.

## II.	PARTIES

3.	Plaintiff Rodney M. Samuelson, M.D. ("Dr. Samuelson") is a citizen of the United States of America and a resident of Pennington County, South Dakota, at all times relevant to this matter.

4.	From approximately July 13, 2015, to August 4, 2021, Dr. Samuelson was employed by Defendants.

5.	Upon information and belief, Defendant Monument Health, Inc., f/k/a Regional Health, Inc. is a South Dakota non-profit corporation authorized to do business in South Dakota, with its principal place of business in Pennington County, South Dakota, and at the times mentioned, employed Dr. Samuelson.

6.	Upon information and belief, Defendant Monument Health Rapid City Hospital, Inc. f/k/a Rapid City Regional Hospital, Inc., is a South Dakota non-profit corporation authorized to do business in South Dakota, with its principal place of business in Pennington County, South Dakota, and at the times mentioned, employed Dr. Samuelson.

7.	Monument Health, Inc., f/k/a Regional Health, Inc. is the sole member of Monument Health Physicians, Inc., f/k/a Regional Health Physicians, Inc., and Monument Health Rapid City Hospital, Inc., f/k/a Rapid City Regional Hospital, Inc.

8.	Defendants are "employers" within the meaning of 42 U.S.C. § 12111 in that they engage in an industry affecting commerce and have employed more than the requisite number of

persons for the requisite duration under the Americans with Disabilities Act ("ADA").  All Defendants are hereinafter referred to as "Monument Health".

9.      Defendants are a single employer, joint employers, and/or constitute an integrated enterprise under the ADA.  These Defendants are significantly interrelated.  These Defendants have common management.  There exists a centralized control of the labor relationship between these Defendants.  There exists common ownership or financial control between these Defendants.

10.     For all purposes, Defendants are sufficiently integrated as to constitute a single employer, and as such, are all liable for the causes of action stated herein.

### III. PROCEDURAL REQUIREMENTS

11.     On August 20, 2021, Dr. Samuelson submitted a Charging Party Intake Form for Employment Discrimination and Intake Questionnaire for Potential Disability Discrimination Complaint to the South Dakota Department of Labor and Regulation, Division of Human Rights. Such intake form was provided within 180 days of the unlawful employment practice.

12.     On August 23, 2021, the South Dakota Department of Labor and Regulation, Division of Human Rights confirmed receipt of the submission.

13.     On September 30, 2021, Dr. Samuelson filed a signed Charge of Discrimination against Defendants with the South Dakota Department of Labor and Regulation Division of Human Rights, thereby satisfying the requirements of 42 U.S.C.A. § 2000e-5(b), (e).  Such charge was filed within 180 days of the unlawful employment practice.

14.     On September 14, 2023, the South Dakota Department of Labor and Regulation Division of Human Rights returned a final determination finding no probable cause to believe that Dr. Samuelson's allegations of discrimination were supported.

15. On September 26, 2023, Dr. Samuelson received the EEOC's Letter of Determination and Notice of Rights. This notice was received less than ninety days prior to the filing of this Complaint.

16. The incidents described in Parts IV and V below were part of a continuing series of incidents of discrimination which began in or about September of 2019 and which constitute a continuing violation of Dr. Samuelson's ADA rights.

## IV. BACKGROUND FACTS

17. Dr. Samuelson restates and realleges the foregoing allegations as though fully set forth herein.

18. In June 2015, Dr. Samuelson entered an employment agreement with Monument Health. Within the month, Dr. Samuelson began work.

19. In 2016, Monument Health's Chief Operating Officer Paulette Davidson regarded Dr. Samuelson as having a "personality issue" when addressing a personnel dispute. Monument Health staff began discussing whether Dr. Samuelson had a personality disorder.

20. In March or April 2018, Lyssa Towl ("Towl"), a consultant working with Dr. Samuelson on efficiency and billing practices, met with Monument Health administrators Parul Bisla and Dr. Mark Longacre regarding her work with Dr. Samuelson.

21. Dr. Samuelson had Monument Health administrators' permission to work with Towl on projects including professional communication, practice efficiency, and productivity. Dr. Samuelson had a confidentiality agreement with Towl so as to protect against patient information disclosure.

22.    While working with Towl as a consultant, Dr. Samuelson emailed patient information to Towl with Monument Health administrators' knowledge, and pursuant to the confidentiality agreement with Towl.

23.    In mid-2018, Parul Bisla verbally asked Dr. Samuelson to discontinue sharing protected health information with Towl.  Dr. Samuelson complied immediately.  That issue was resolved at that time.

24.    On September 25, 2019, Dr. Samuelson emailed Dr. Mark Longacre regarding a list of changes he sought to increase his productivity and have a more successful practice.

25.    In November 2019, Dr. Samuelson met with Monument Health administrators and physicians Dr. Marc Longacre, Dr. Steve Maser, and Alicia Syverson, regarding Morbidity and Mortality ("M&M") meetings with Dr. Fulbright.  Dr. Samuelson was informed he was required to attend the M&M meetings despite Dr. Samuelson's complaints that Dr. Fulbright treated Dr. Samuelson discriminatorily and unfairly at those meetings and otherwise.

26.    Monument Health hired Dr. Cleve Trimble ("Dr. Trimble") in late 2019 as a professional coach.  As Monument Health has described, one of Dr. Trimble's assigned roles was "to enhance Dr. Samuelson's ability to interact effectively with the neurosurgery clinic support staff and to develop skills to collaborate with the clinic's leadership."

27.     In November 2019, Dr. Samuelson first met with Dr. Trimble.

28.    On November 6, 2019, Monument Health informed Dr. Samuelson that personal consultants and assistants who do not have a contract with it should not be given operational data or information.  Dr. Samuelson had already ceased sending Towl patient information in mid-2018 at the request of Parul Bisla.

29.    In January 2020, Dr. Trimble informed Monument Health administrators and physicians Dr. Mark Longacre, Dr. Steve Maser, and Alicia Syverson, that Dr. Samuelson had a personality issue akin to autism.

30.    Dr. Trimble gave recommendations as to how to accommodate Dr. Samuelson and improve internal operations for Dr. Samuelson.  Monument Health failed to adopt Dr. Trimble's recommendations regarding Dr. Samuelson.

31.    Dr. Trimble later resigned because Monument Health refused to adopt his recommended changes to assist Dr. Samuelson with his condition, and Monument Health continued to treat Dr. Samuelson inequitably and discriminatorily.

32.    In early 2020, shortly before Monument Health instituted mandatory COVID-19 masking policies, Dr. Maser warned Dr. Samuelson that he was not allowed to wear a mask in the hospital because it was against hospital policy.

33.    In August 2020, Dr. Kyle Schmidt informed Dr. Samuelson that Dr. Samuelson saw the most patients and had more established patients than any other neurosurgeon for Monument Health.

34.    On October 9, 2020, Dr. Samuelson informed Monument Health that his nurse, Catrina Engesser, was an exceptional employee.  Dr. Samuelson further indicated that Monument Health could not afford to lose her due to burn-out and inadequate pay.

35.    On October 14, 2020, Dr. Samuelson received a written warning from Monument Health for accessing Dr. Samuelson's minor son's COVID test results.  The warning was signed by Dr. Maser and Dr. Longacre.

36.    On November 10, 2020, Dr. Samuelson responded with a rebuttal memorandum to the written warning, explaining he only looked at his son's COVID test results because it was

a health care emergency.  He informed Monument Health that he received information about potential coronavirus symptoms in his home where he lived with his son and his two parents who were 79 and 80 years old.  Dr. Samuelson's son was getting tested for COVID-19 and had he tested positive, Dr. Samuelson could not continue seeing patients if he was in contact with his son and he would also need to quarantine his elderly parents and himself from his son in their home.

37.    On November 24, 2020, Dr. Maser informed Dr. Samuelson that his appeal was refused.  He further informed Dr. Samuelson that a physician should not look at the records of himself or a family member, and that the situation Dr. Samuelson described was not an emergency in his opinion.

38.    On December 29, 2020, Dr. Samuelson's counsel sent a letter to Monument Health's in-house counsel stating Dr. Samuelson is protected under the ADA due to a traumatic brain injury (hereinafter "TBI") sustained in 1993 and its resulting symptoms to Dr. Samuelson's personality and mental characteristics.  The letter informed Monument Health that Dr. Samuelson's condition causes him to struggle with effective communication and interaction with others, thereby impacting Dr. Samuelson's ability to communicate and interact in the workplace.

39.    The above-mentioned letter also contained reasonable accommodations requests, including 1) that his TBI and resulting effects be disclosed to the staff with which he works to help curb misunderstandings and resentment from communication conflicts; 2) that his patient caseload be modified to an equitable number of new patient consultations to create a fair workload; and 3) for a nurse to be dedicated to his clinic service.

40.    Monument Health's in-house legal counsel Paula McInerney-Hall sent an acknowledgment email on December 30, 2020, confirming they received the letter and informing Dr. Samuelson that the ADA coordinator was out of the office.

41.    On January 11, 2021, Monument Health informed Dr. Samuelson that on March 15, 2021, his nurse Catrina Engesser would be moving to a new position in neurosurgery and would no longer be assisting Dr. Samuelson.

42.    On January 14, 2021, Monument's in-house counsel, Jason Green, informed Dr. Samuelson that Defendants had not received an ADA accommodations request.

43.    On January 15, 2021, Monument Health's in-house counsel Green sent an accommodations request form to Dr. Samuelson and required Dr. Samuelson to fill out the form.

44.    On that same day, based on an anonymous complaint, Dr. Maser scolded Dr. Samuelson about wearing his mask "incorrectly" although Dr. Maser did not know how Dr. Samuelson was incorrectly wearing his mask.

45.    On February 3, 2021, Dr. Samuelson provided Monument Health with his job accommodations forms filled out and signed by Dr. Samuelson.

46.    On February 8, 2021, Doug Williams, a Monument Health human resources administrator, informed Dr. Samuelson that it was Defendants' policy to not allow attorneys or advocates in ADA accommodations meetings.

47.    There is no Monument Health policy prohibiting attorneys or advocates in ADA accommodations meetings.

48.    On February 9, 2021, Defendants again denied Dr. Samuelson's request to have his attorney or an advocate present in the upcoming ADA accommodations meetings.

49.    In a letter dated February 26, 2021, Dr. Samuelson's counsel again requested to be present during the ADA accommodations meetings.  His counsel informed Monument Health that good faith participation in the interactive process recognizes that Dr. Samuelson's disability requires someone to interpret interpersonal communications and facilitate self-advocacy.

50.    Dr. Samuelson's counsel also requested Defendants obtain a report from Dr. Trimble for use at any ADA accommodations meetings, but Monument Health denied the requests.

51.    On March 1, 2021, Defendants notified Dr. Samuelson that a reasonable-accommodations meeting was scheduled for March 3rd without inquiring about Dr. Samuelson's availability.  Dr. Samuelson's counsel requested the meeting be rescheduled for a future time when Dr. Samuelson was available to attend.  Because of the wording and the pressure used, Dr. Samuelson was intimidated by Monument Health's conduct.

52.    On March 3, 2021, Defendants confirmed that they would cancel the meeting set for that day.  Monument Health informed Dr. Samuelson that it would concede on its advocate ban by allowing him to bring one advocate, but the advocate could not be an attorney. Monument Health required Dr. Samuelson provide, by the following day, two dates that he and his advocate would be available within the next two weeks.

53.    On March 4, 2021, Dr. Samuelson's counsel informed Defendants that their policy discriminated against those with disabilities, that Dr. Samuelson was entitled to have an adequate advocate at his meeting, and to prohibit his attorney from the meeting was akin to forbidding a deaf person from having his interpreter attend.  Dr. Samuelson's counsel further informed Defendants that Dr. Trimble was willing to provide a report upon their request, and

encouraged Defendants to make that request to further understand Dr. Samuelson's disability and the appropriate accommodations.

54. Defendants again refused to request a report from Dr. Trimble regarding his recommendations to Dr. Samuelson's disability.

55. On March 30, 2021, Dr. Samuelson's counsel again urged Monument Health permit Dr. Samuelson's counsel to partake in the interactive process. Monument Health denied this request on April 9, 2021.

56. On April 9, 2021, Monument Health first requested Dr. Samuelson fill out its Medical Provider Inquiry Form.

57. The first ADA accommodations meeting was held on April 19, 2021. Monument Health human resources administrators Doug Williamson and Moni Patterson, and Dr. Steve Maser attended. Dr. Samuelson was denied his advocate of choice and was given no time to find another who could serve in that role, so he asked his nurse Joanne Gunderson to attend with him.

58. During the first ADA accommodations meeting, Dr. Samuelson additionally requested, among other things: 1) that Dr. Samuelson be allowed to take his vacation time and protection from Dr. Fulbright's termination threats if Dr. Samuelson took a vacation; 2) that Defendants allow Dr. Samuelson to not attend Dr. Fulbright's M&M meetings in person; 3) that Dr. Samuelson be treated fairly, not be retaliated against, and be provided support while building his practice and dealing with his disproportionately-large workload; 4) a dedicated nurse to his service; 5) that Monument Health not require face-to-face meetings with more than one administrator at a time, and be permitted to respond to administrators via email; 6) to be treated the same as other neurosurgeons employed by Defendants including an equitable workload, call

-10-

duties, directives, and staffing; and 7) be permitted to wear a mask, or modify a mask, in a way that does not further irritate the skin cancer scar on his nose.

59.     At the end of the meeting, Monument required Dr. Samuelson to get fitted for a mask.  Dr. Samuelson was intimidated by this interaction because he was threatened during the ADA meeting with being out of compliance with the mask fitting requirements. No other action was taken.

60.     The following day, Monument Health sent emails providing Dr. Samuelson with its mask procedure, guidance, and email update regarding two mask policies, neither of which applied to Dr. Samuelson's specific conditions or concerns.  The emails also contained a request for Dr. Samuelson to set up a time with Employee Health to be fitted for a mask.

61.     On May 2, 2021, Dr. Samuelson's counsel requested a copy of its employee handbook.  No employee handbook was ever provided.  Dr. Samuelson's counsel also again requested that Monument Health obtain a report from Dr. Trimble; however, Monument denied that request.

62.     On May 3, 2021, the second ADA accommodations meeting was held.  Moni Patterson, Doug Williamson, and Dr. Maser attended, and Monument Health continued to refuse to allow Dr. Samuelson's attorney to attend.

63.     During the meeting, Dr. Samuelson discussed: 1) that the workload on new consults and chronic patients become more fairly distributed between physicians; 2) that he be permitted vacation time with protections from Dr. Fulbright's threats of retaliation for him taking time off; 3) that he not have to attend Dr. Fulbright's M&M meetings in person; and 4) that all complaints against him be reduced to writing, be investigated, and have a final determination on each claim.

64.    In the meeting, Defendants acknowledged and agreed that Dr. Samuelson was considered or regarded as disabled.

65.    Monument Health hired Dr. Amilyn Taplin, a new neurosurgeon, in May 2021.

66.    On May 14, 2021, Monument Health's in-house counsel requested information from Dr. Samuelson's treating providers.

67.    The third and final ADA meeting took place on May 17, 2021.  On that day, Moni Patterson informed Dr. Samuelson that she was working on his ADA accommodations requests.

68.    After the May 17, 2021, interactive process meeting, another "anonymous" complaint was filed against Dr. Samuelson.  Upon information and belief, Dr. Maser informed Dr. Fulbright of Dr. Samuelson's ADA accommodations requests.  After Dr. Maser leaked the ADA accommodations information to Dr. Fulbright, an "anonymous" complaint was filed against Dr. Samuelson.  Upon information and belief, that anonymous complaint was made by Dr. Fulbright.

69.    As a result of the complaint, Dr. Maser ordered Dr. Samuelson to attend Dr. Fulbright's 6:00 am Morbidity & Mortality meeting on July 7, 2021, to respond to the "anonymous" complaint.  In response to Dr. Maser's summons, Dr. Samuelson's counsel informed Monument Health that such conduct violates the ADA because it is both retaliatory and fails to institute any reasonable accommodations repeatedly requested.

70.    On June 28, 2021, Director of Nursing, Ambulatory and Surgical Operations at Monument Health Orthopedic and Specialty Hospital Alicia Syverson[1] sent Doug Williamson an email regarding Dr. Samuelson's girlfriend texting Dr. Samuelson's nurse requesting his work schedule.

---

[1] Now the Director of Value Based Care.

71.    On June 30, 2021, Moni Patterson sent a letter to Dr. Samuelson that they received his workplace accommodations request but had not received documentation from his treating physicians and were closing his request.

72.    On July 1, 2021, Dr. Samuelson's counsel inquired why Dr. Samuelson's ADA accommodations request was being closed.  Dr. Samuelson's counsel requested time to provide Defendants with the requested documentation regarding Dr. Samuelson's TBI and resulting symptoms, as Dr. Samuelson would have to be seen and evaluated by a psychologist to create a current record and his 1993 TBI records were not readily obtainable.  Dr. Samuelson's counsel again requested a report from Dr. Trimble be sought.  On July 6, 2021, Defendants indicated they would resume the ADA accommodations request upon the necessary medical records being provided.

73.    The next day, Defendants' counsel reiterated that they would not be requesting a report from Dr. Trimble with respect to Dr. Samuelson.

74.    On July 9, 2021, Dr. Samuelson met with Dr. Shankar Kurra, Vice President of Medical Affairs.  Dr. Kurra informed Dr. Samuelson that he would request a report from Dr. Trimble.  Dr. Kurra stated that no person should be treated the way Dr. Samuelson had been treated, and that Dr. Samuelson should contact the head of Human Resources, Trina Allan, about this.  However, no report was ever actually sought.

75.    Dr. Samuelson contacted Trina Allan as instructed, who also denied his request for an attorney to be present during their meeting.  A meeting between the two never occurred, although Trina Allen had knowledge of Dr. Samuelson's concerns.

76.    On July 12, 2021, Dr. Samuelson was summoned to a meeting with three administrators, the Manager of Internal Audit Sandi Fuerst, the Human Resources Business

-13-

Partner Doug Williamson, and the Executive Medical Director of Orthopedics and Neurosurgery Dr. Maser. He was provided no notice nor was he informed what the meeting would cover. The meeting discussed the incident regarding his girlfriend requesting his work schedule. Dr. Samuelson assured Defendants that no protected health information was disclosed to her or would be seen by her if she saw his work schedule. Dr. Samuelson allowed Sandi Fuerst to examine his cell phone and its HIPAA-compliant work calendar that had been created by Monument's IT department. This confirmed that there was no PHI on his work calendar. Dr. Samuelson was told that he could not discuss the meeting with anyone because Defendants have a "retaliation policy."

77.     Having proven that neither Dr. Samuelson nor his girlfriend had improperly disclosed or seen any PHI, the issue was resolved and Monument Health had no non-pretextual reason to further to pursue any additional investigation as to whether his girlfriend had seen PHI.

78.     On July 21, 2021, Monument Health's legal department requested an investigation of Dr. Samuelson's emails over the course of his employment. The investigation began on July 22, 2021. The investigation spanned the entire duration of Dr. Samuelson's employment.

79.     On July 23, 2021, Dr. Samuelson's counsel provided Defendants with Dr. Samuelson's psychologist, Dr. Scott Sternhagen's medical provider form.

80.     On July 26, 2021, IT finalized the audit of Dr. Samuelson's emails and submitted it to Defendants' in-house counsel. The audit report indicated that ten emails from Dr. Samuelson's work email account contained protected health information ("PHI") and violated HIPAA, according to the IT employee.

-14-

81.    The IT report was either prepared by someone without sufficient expertise in HIPAA law, or was prepared under instruction to find HIPAA violations regardless of the facts or law.  The report erroneously or purposefully concluded that emails containing PHI were HIPAA violations when they did not violate HIPAA law.

82.    On August 2, 2021, a summary of the report was sent to Defendants' HIPAA Disciplinary Team, which categorized Dr. Samuelson's conduct as a "category five" violation.

83.    The Disciplinary Team comprised of Vice President of Human Resources Trina Allen, Vice President of Corporate Responsibility Nancy Klunder, Associate General Counsel Jason Green, Privacy Officer Jill Murray, Privacy Officer Jennifer Hansen, Manager of internal Audits Sandi Fuerst, Executive Medical Director for Orthopedics and Neurosurgery Dr. Maser, and Vice President of Operations Dr. Longacre.  Multiple individuals who were a part of the HIPAA Disciplinary team were also involved with Dr. Samuelson's ADA accommodations process.

84.    According to Monument Health's internal document describing such categories, "category five" violations are punishable by termination.  A category five violation is defined as the "[w]illful and intentional violation with actual or potential harm to a patient or the organization."  Monument Health's own examples of conduct that falls in category five includes one who "Knowingly disclose[s] PHI to any unauthorized individual or entity; disclose[s] PHI for [an] illegal purpose; post[s] PHI to social media Web sites or unauthorized release of PHI to the media."

85.    Monument Health's HIPAA Disciplinary Team decided to deem Dr. Samuelson's conduct of three years' previous as a category five so that they could terminate Dr. Samuelson's employment.

86.    Dr. Samuelson took a short, planned vacation where he planned to return to work on August 3, 2021.  Within one hour upon his return to work on August 3, 2021, Dr. Samuelson was notified of a meeting scheduled August 4, 2021.

87.    On August 4, 2021, Monument Health's in-house counsel refused to accept Dr. Samuelson's treating provider form because it was completed by a psychologist and not a medical doctor.

88.    On August 4, 2021, Monument Health's administrators Sandi Fuerst, Dr. Maser, and Doug Williamson, interviewed Dr. Samuelson regarding the emails sent from his work email to his personal email.  Dr. Samuelson's attorney was not permitted to attend.  During the meeting, Dr. Samuelson requested the questions be in writing.  Sandi Fuerst responded by indicating that Monument Health was not required to do so and continued her questioning.  After all questions were asked, the three administrators left the room to convene with Dr. Longacre and in-house counsel Jason Green.  Jason Green informed the rest that "there was enough information/evidence to move forward with termination."

89.    Following the meeting, Dr. Maser and Doug Williamson again met with Dr. Samuelson to terminate his employment for allegedly violating HIPAA and/or hospital policy three years' previous.  Dr. Samuelson was hand-delivered a termination letter.  The letter stated, in relevant part, that Dr. Samuelson was terminated because

> numerous instances were discovered where [Dr. Samuelson] inappropriately used your personal cell phone to photograph patients and Monument Health Electronic Health Record screens containing PHI.  Additionally, a multitude of instances were identified where you sent PHI to third parties in violation of the privacy rights of patients and Monument Health policy.

-16-

90.     Dr. Samuelson was not permitted or provided the opportunity to cure any alleged reasons for his termination despite his employment contract expressly permitting him 30 days to cure any alleged breach.

91.     On August 11, 2021, neurosurgeon Dr. Amilyn Taplin started work for Defendants.

92.     It was a common practice for Monument Health staff to photograph patients and computer screens and to email or text other providers and consultants patient health information.

93.     On August 19, 2021, Dr. Samuelson's counsel sent Monument Health an electronic hold letter requesting Monument Health to inform its

> Medical provider/staff of their duty to preserve all e-mail, video, audio, text messages, and any and all other electronic data they possess that may be in any way relevant to Dr. Rodney Samuelson's employment or termination.  In addition, and very significantly, please advise each and every Monument medical provider that they must preserve all personal or work cell phone photographs of patients and photographs of Monument Health Electronic Health Record screens containing PHI.  These medical providers must also preserve all communications in which they sent PHI to any third party which may have been in violation of the privacy rights of patients and Monument Health policy.

94.     In the August 19, 2021, letter Dr. Samuelson's legal counsel informed Monument Health that many of its physicians used their cell phones to take photographs of PHI and emailed or texted the same.

95.     Monument Health did not institute a written electronic litigation hold instruction to any employees.

96.     Monument Health admitted that it did not ask its employees to preserve personal or work cell photographs of patients and photographs of medical records, or text or email messages containing PHI, after receiving Dr. Samuelson's letter dated August 19, 2021, because

> Monument is unaware of any other employee taking personal or work cell phone photographs of patients and photographs of medical records, text or email

messages containing PHI, because that would be in violation of both Monument policy and federal law.  Accordingly, Monument believed any such instruction was unnecessary.

97.     On September 30, 2021, Dr. Samuelson's counsel sent a courtesy copy of Dr. Samuelson's charge of discrimination to Monument Health.

98.     On November 4, 2021, Monument Health's Chief Medical Officer Dr. Brad Archer unnecessarily filed a complaint with South Dakota Board of Medical and Osteopathic Examiners seeking disciplinary action against Dr. Samuelson.  Defendants alleged that Dr. Samuelson engaged in unprofessional behavior by disseminating patients' protected health information.  The letter contained false information and false legal conclusions.

99.     On February 25, 2022, the South Dakota Board of Medical and Osteopathic Examiners closed the complaint without taking any action against Dr. Samuelson.

100.    In June 2022, Monument Health sent a draft state court complaint to deter Dr. Samuelson's pursuit of his ADA claim that was pending with the South Dakota Department of Labor.

101.    Dr. Samuelson sought to take Dr. Cleve Trimble's deposition early, before he was able to file his federal complaint, to preserve his testimony.  His attorney made repeated inquiries to do so, with no response from Monument Health.

102.    On October 10, 2022, Monument Health filed suit in state court seeking declaratory judgment that Monument Health terminated Dr. Samuelson appropriately under his employment contract, and repeatedly took the position that the ADA allegations were not relevant to the matter.  In other words, Monument Health engaged in a "race to the courthouse", seeking a declaratory judgment regarding Dr. Samuelson's termination that excluded any review

-18-

of ADA-related facts and law, and for use as *res judicata* against Dr. Samuelson's eventual federal ADA lawsuit.

103. The ADA prohibits filing retaliatory claims that deter or interfere with a claimant pursuing his ADA rights.

104. Monument Health state court lawsuit against Dr. Samuelson contained other frivolous, malicious, and nonjusticiable claims.

## V. CLAIMS FOR RELIEF

### COUNT ONE – ADA DISCRIMINATION

105. Dr. Samuelson restates and realleges the foregoing allegations as though fully set forth herein.

106. Monument Health engaged in unlawful and discriminatory employment practices directed at Dr. Samuelson.

107. The effect of the Defendants' unlawful employment practices has been to limit, classify, and discriminate against Dr. Samuelson in ways jeopardizing and depriving him of employment opportunities and otherwise adversely affecting his status as an employee because of his disability in violation of the ADA.

108. Defendants unlawfully failed to make reasonable accommodations for his known social/mental limitations both before and after he reasonably notified Defendants of his ADA accommodations request.

109. Dr. Samuelson meets the statutory requirement of an "individual with a disability" as Dr. Samuelson has a physical or mental impairment that substantially limits one or more major life activities.

110.    Dr. Samuelson suffered a traumatic brain injury ("TBI") from an accident in 1993, which caused symptoms akin to autism or Asperger's Syndrome.  This disability was confirmed to Monument Health by Dr. Scott Sternhagen, PhD.

111.    Dr. Samuelson's disability manifests itself akin to autism in social situations including the inability to read social cues, self-advocate, navigate office politics, and generally effectively communicate in person and interact with others, especially in contentious situations or when outnumbered.

112.    Dr. Samuelson's TBI manifests itself as a physiological condition and a psychological disorder.  Dr. Samuelson's TBI and resulting symptoms are the direct cause of Dr. Samuelson's issues that arise in social situations.

113.    Monument Health was previously aware of Dr. Samuelson's attributes, even if Monument Health did not know the cause was TBI.

114.    Dr. Samuelson informed Defendants of his TBI on December 29, 2020.  On that same day, Dr. Samuelson requested reasonable accommodations under the ADA.

115.    On April 9, 2021, Monument Health first requested Dr. Samuelson to fill out and provide Defendants its unnecessary accommodations request form.  Dr. Samuelson provided the form on August 4, 2021.  Monument Health received but rejected the form because it was filled out by a psychologist and not a medical doctor.

116.    Dr. Samuelson has a record of receiving ADA accommodations for his TBI.  In 1996, Dr. Samuelson received ADA accommodations to wear ear plugs and sit in a room alone while taking his Medical College Admissions Test.

117.    Dr. Samuelson's TBI affects multiple major life activities, including interacting with others and communicating.  Specifically, Dr. Samuelson is hindered in communicating and

contributing to social situations as an average person in the general population is able to do in like situations.

118.    Dr. Samuelson's communication limitations substantially limit his very ability to adequately convey his own limitations, to read social cues, to self-advocate, and to navigate multiple people in an in-person setting.  Knowing this, Dr. Samuelson repeatedly requested his attorney to be present in ADA accommodation meetings, which Monument Health repeatedly denied.

119.    Monument Health forced Dr. Samuelson to communicate with them in the ADA accommodation process in the very way he indicated he was unable to, due to his disability. Such a situation is akin to requiring a deaf person to verbally discuss his accommodation request with no interpreter when his accommodation request is to be allowed an interpreter so that he can communicate effectively at work.

120.    Dr. Samuelson was left vulnerable to inequitable treatment as compared to his colleagues due to his inability to self-advocate.  The workplace discrimination took the form of substantially larger patient loads and of the most difficult patients, extended work hours, denied vacation, and lower pay despite his considerable qualifications, expertise, seniority, and a huge caseload.

121.    Although Dr. Samuelson met all requirements under the ADA for accommodations, Defendants violated his rights by terminating him in retaliation for his accommodations request.

122.    Dr. Samuelson was and is qualified to be a neurosurgeon for Defendants and is able to perform the essential functions of the job with or without reasonable accommodations.

123.    Dr. Samuelson was the top student at his medical school and had two prestigious fellowships. During his time of employment with Monument Health, he was the most senior surgeon among all specialties, had full neurosurgery board certifications, and was the highest trained neurosurgeon in the State of South Dakota.

124.    Defendant knew of Dr. Samuelson's personality and communication shortcomings, whether they were caused by TBI or not, and caused or allowed Dr. Samuelson to be treated differently than the other neurosurgeons at Monument Health.

125.    Monument Health refused to implement Dr. Cleve Trimble's recommendations to address Dr. Samuelson's communication and disparate-treatment issues.

126.    Dr. Samuelson was unlawfully denied monetary and non-monetary benefits and suffered other damages in sums to be proved at trial.

127.    Defendants' actions were done with malice or reckless indifference to Dr. Samuelson's federally-protected rights.

128.    Based on Defendants' actions, Dr. Samuelson is entitled to compensatory and punitive damages, together with interest and attorneys' fees and costs.

129.    Dr. Samuelson is entitled to recover from the Defendants' reasonable attorneys' fees and expenses as provided in 42 U.S.C. § 12205.

## COUNT TWO – FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS IN GOOD FAITH UNDER THE ADA

130.    Dr. Samuelson restates and realleges the foregoing allegations as though fully set forth herein.

131.    Dr. Samuelson made numerous reasonable accommodation requests under the ADA beginning on December 29, 2020.

132.    Monument Health delayed its response to Dr. Samuelson's December 29, 2020, reasonable-accommodations request.

133.    After Dr. Samuelson made his ADA accommodations request, Defendants eventually held three meetings where Dr. Samuelson was not permitted to have his counsel present.

134.    During these meetings and in dealing generally with Dr. Samuelson and his counsel, Defendants failed to meaningfully engage in the required interactive process in good faith.

135.    Defendants never requested a report from Dr. Cleve Trimble regarding Dr. Samuelson.  Defendants have refused to seek any advice or reports from Dr. Trimble regarding Dr. Samuelson despite multiple requests from Dr. Samuelson and his counsel.

136.    Dr. Trimble informed Dr. Samuelson that he would furnish a report regarding Dr. Samuelson's ADA accommodations request upon Defendant's request for the report, as he could not volunteer one under the confidentiality agreement he was required to sign with Monument Health.

137.    Monument Health had no policy forbidding an attorney or other advocate to be present at an ADA reasonable-accommodations meeting.

138.    Monument Health originally forbade Dr. Samuelson to have any advocate present during the ADA accommodations despite Dr. Samuelson's requests.  Once Monument Health did concede to permit Dr. Samuelson an advocate, it prohibited him from having an attorney be his advocate.

139.    Dr. Samuelson's counsel informed Defendants that denying Dr. Samuelson the use of a well-trained advocate to help him overcome his disability is a discriminatory policy.

-23-

140.    Monument Health did not provide Dr. Samuelson its Health Physician Job Description, Medical Provider Inquiry Form, and Provider Medical Release until April 9, 2021. Dr. Samuelson's ADA accommodations request had been ongoing for four months.

141.    Three ADA accommodations meetings were held.  Monument Health prohibited Dr. Samuelson from bringing his attorney to any of the meetings.

142.    Monument Health took no action in regard to Dr. Samuelson's ADA accommodations requests.  Nor did Monument Health propose any solutions to reasonably accommodate his disability.

143.    During the course of the interactive process, Monument Health hired a new neurosurgeon to replace Dr. Samuelson.

144.    After the final ADA meeting, Moni Patterson informed Dr. Samuelson that she was working on his accommodations and that she would be in contact if she needed anything for the request.

145.    After the final ADA accommodations meeting, upon information and belief, Dr. Maser informed Dr. Fulbright of Dr. Samuelson's ADA accommodations request.  As a result, Dr. Fulbright retaliated against Dr. Samuelson by requiring Dr. Samuelson to attend a 6:00am Morbidity & Mortality meeting where Dr. Fulbright humiliated and mistreated Dr. Samuelson.

146.    On June 30, 2021, Moni Patterson sent Dr. Samuelson a letter closing his ADA accommodations request.

147.    One or more, or all of Dr. Samuelson's requested accommodations were reasonable.

148.    Dr. Samuelson entered each meeting with a willingness to work with Monument Health to find reasonable accommodations that would work for both parties.  Dr. Samuelson

tried to provide all documentation and meet all requests despite Monument Health constantly creating new barriers for him throughout the interactive process.

149.    Dr. Samuelson's employment was terminated on August 4, 2021.  Monument Health's new neurosurgeon began working just days later.

150.    Dr. Samuelson was unlawfully denied monetary and non-monetary benefits and suffered other damages in sums to be proved at trial.

151.    Defendants' actions were done with malice or reckless indifference to Dr. Samuelson's federally-protected rights.

152.    Based on Defendants' actions, Dr. Samuelson is entitled to compensatory and punitive damages, together with interest and attorneys' fees and costs.

153.    Dr. Samuelson is entitled to recover from the Defendants' reasonable attorneys' fees and expenses as provided in 42 U.S.C. § 12205.

### COUNT THREE – FAILURE TO ACCOMMODATE UNDER THE ADA

154.    Dr. Samuelson restates and realleges the foregoing allegations as though fully set forth herein.

155.    Dr. Samuelson's TBI exhibits symptoms akin to autism spectrum disorder including the inability to communicate and interact with others in an effective manner.

156.    Despite Monument Health's acknowledgement of Dr. Samuelson's disability before and on May 3, 2021, and Dr. Samuelson providing all necessary documentation to Monument Health, Monument Health never accommodated Dr. Samuelson for his disability.

157.    Dr. Samuelson's impairment substantially impaired a major life activity.  His impairment substantially impaired his ability to communicate and navigate office politics.  A

result of Dr. Samuelson's communication barrier, he experienced inequitable and discriminatory treatment in the workplace.

158.    Dr. Samuelson performed the essential functions of being a neurosurgeon throughout his time with Monument Health.  Defendants, however, treated Dr. Samuelson inequitably by taking advantage of Dr. Samuelson without providing reasonable accommodations.

159.    Dr. Samuelson was not afforded the same level of benefits and privileges that were available to similarly-situated employees who were not disabled.  Reasonable accommodations would have assisted Dr. Samuelson's major life activity limitations and further assisted in his performance as a neurosurgeon.

160.    One or more, or all accommodations Dr. Samuelson requested were reasonable. However, Defendants failed to make any accommodations to alleviate Dr. Samuelson's disclosed disability.  Nor did Defendants seek advice or recommendations from its professional coach Dr. Cleve Trimble regarding Dr. Samuelson's situation.

161.    Dr. Samuelson was unlawfully denied monetary and non-monetary benefits and suffered other damages in sums to be proved at trial.

162.    Defendants' actions were done with malice or reckless indifference to Dr. Samuelson's federally-protected rights.

163.    Based on Defendants' actions, Dr. Samuelson is entitled to compensatory and punitive damages, together with interest and attorneys' fees and costs.

164.    Dr. Samuelson is entitled to recover from the Defendants' reasonable attorneys' fees and expenses as provided in 42 U.S.C. § 12205.

## COUNT FOUR – RETALIATION FOR MAKING
## AN ADA ACCOMMODATION REQUEST
(ADA—42 U.S.C. § 12203(a)–(b))

165. Dr. Samuelson restates and realleges the foregoing allegations as though fully set forth herein.

166. Monument Health retaliated against Dr. Samuelson for asserting his ADA rights.

167. In the accommodation process, Monument Health required Dr. Samuelson to do the very things for which he was requesting accommodations.

168. Monument Health required Dr. Samuelson to attend a Morbidity & Mortality meeting to defend a baseless anonymous complaint after he made his ADA accommodations request, and was ridiculed at that meeting.

169. Dr. Samuelson was summoned to multiple meetings without an advocate present to defend himself against alleged violations of Monument Health's policies and HIPAA. When Dr. Samuelson requested the inquiries be distilled to writing, Monument Health responded by saying they were not required to do so and continued his questioning.

170. Dr. Samuelson was terminated the same day Monument Health closed/denied his ADA accommodations request.

171. The conditions imposed on Dr. Samuelson alone would dissuade a reasonable worker in the same or similar circumstances from pursuing a charge of discrimination. Dr. Samuelson's termination and post-termination treatment would further dissuade a reasonable worker from pursuing a charge of discrimination.

172. After Dr. Samuelson was terminated, and after he filed his charge of discrimination with the South Dakota Department of Labor, Monument Health unnecessarily and

in retaliation filed a complaint with the South Dakota Board of Medical and Osteopathic

Examiners and filed a state court lawsuit against him.

173.    Dr. Samuelson was not permitted or provided the opportunity to cure any alleged

reasons for his termination despite his employment contract expressly permitting him 30 days to

cure any alleged breach.

174.    Monument Health's reasons disclosed for Dr. Samuelson's termination was

pretext.

175.    After his termination, Monument Health's Chief Medical Officer Dr. Brad Archer

unnecessarily filed a complaint with the South Dakota Board of Medical and Osteopathic

Examiners seeking disciplinary action against Dr. Samuelson.  Defendants alleged that Dr.

Samuelson engaged in unprofessional behavior by disseminating patients' protected health

information.  The Board took no action against Dr. Samuelson and closed the complaint on

February 25, 2022.

176.    Monument Health then sent a draft complaint threatening suit in June 2022.   The

draft complaint was intended to deter Dr. Samuelson's pursuit of his ADA claims that were

pending in front of the South Dakota Department of Labor and interfere with Dr. Samuelson's

ADA claims.

177.    Monument Health filed suit in state court seeking declaratory judgment that it

terminated Dr. Samuelson lawfully under his contract, but insisted the state court could not

evaluate the true reasons for his termination as would be determined under the ADA claims.

178.    Monument Health would not have terminated Dr. Samuelson but for his asserting

his federal ADA rights.  Monument Health was content with using Dr. Samuelson as it did prior;

however, once he asserted his rights under the ADA, Monument Health became hostile and terminated his employment.

179.    Dr. Samuelson was unlawfully denied monetary and non-monetary benefits and suffered other damages in sums to be proved at trial.

180.    Defendants' actions were done with malice or reckless indifference to Dr. Samuelson's federally-protected rights.

181.    Based on Defendants' actions, Dr. Samuelson is entitled to compensatory and punitive damages, together with interest and attorneys' fees and costs.

182.    Dr. Samuelson is entitled to recover from the Defendants' reasonable attorneys' fees and expenses as provided in 42 U.S.C. §12205.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

A.    Find that the employment practices complained of in this Complaint are unlawful violations of the ADA;

B.    Order that Defendants pay Dr. Samuelson compensatory and punitive damages including, but not limited to, front pay, back pay, including overtime pay, pension benefits, and other employment benefits which would have accrued if Dr. Samuelson's employment had not been terminated;

C.    Award Dr. Samuelson compensatory damages for mental anguish and all other damages allowable by law ;

D.    Order the Defendants to pay Dr. Samuelson's costs, expenses and reasonable attorneys' fees; and

E.    For such other further relief as the Court deems just and equitable.

## JURY TRIAL DEMANDED

Dated:  December 22, 2023.

GUNDERSON, PALMER, NELSON
   & ASHMORE, LLP


By: /s/ Sara Frankenstein
    Sara Frankenstein
    *Attorneys for Plaintiff*
    506 Sixth Street
    P.O. Box 8045
    Rapid City, SD  57709
    Telephone: (605) 342-1078
    Telefax:  (605) 342-9503
    E-mail:  sfrankenstein@gpna.com

-30-

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Rodney Mark Samuelson, M.D.

**DEFENDANTS**

Monument Health, Inc. f/k/a Regional Health, Inc., Monument Health Physicians, Inc., f/k/a Regional Health

**(b)** County of Residence of First Listed Plaintiff    Pennington
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Pennington
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Sara Frankenstein, Gunderson, Palmer, Nelson & Ashmore, LLP, 506 Sixth Street, PO Box 8045, Rapid City, SD  57709 (605) 342-1078

Attorneys *(If Known)*
Delia Druley, Evans Haigh & Arndt, LLP, PO Box 2790, Sioux Falls, SD  57101-2790

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**       **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane       ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product       Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability       ☐ 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &       Pharmaceutical | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| & Enforcement of Judgment | Slander       Personal Injury | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'       Product Liability | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted | Liability       ☐ 368 Asbestos Personal | | New Drug Application | ☐ 470 Racketeer Influenced and |
| Student Loans | ☐ 340 Marine       Injury Product | | ☐ 840 Trademark | Corrupt Organizations |
| (Excludes Veterans) | ☐ 345 Marine Product       Liability | | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment | Liability       **PERSONAL PROPERTY** | **LABOR** | Act of 2016 | (15 USC 1681 or 1692) |
| of Veteran's Benefits | ☐ 350 Motor Vehicle       ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle       ☐ 371 Truth in Lending | Act | **SOCIAL SECURITY** | Protection Act |
| ☐ 190 Other Contract | Product Liability       ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal       Property Damage | Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | Injury       ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | ☐ 362 Personal Injury -       Product Liability | ☐ 751 Family and Medical | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | Medical Malpractice | Leave Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS**       **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights       **Habeas Corpus:** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting       ☐ 463 Alien Detainee | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment       ☐ 510 Motions to Vacate | | or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/       Sentence | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability | Accommodations       ☐ 530 General | | 26 USC 7609 | Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☒ 445 Amer. w/Disabilities -       ☐ 535 Death Penalty | **IMMIGRATION** | | Agency Decision |
| | Employment       **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities -       ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | State Statutes |
| | Other       ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education       ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C 1321 and 1343(a)(4) and 42 USC 12101-12213

Brief description of cause:
ADA Discrimination, failure to accommodate under the ADA, retaliation for making ADA accommodation request

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND S**
Damages continue to

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE    Hon. Veronica L. Duffy    DOCKET NUMBER 5:22-MC-00025

DATE    December 19, 2023

SIGNATURE OF ATTORNEY OF RECORD    *Sara Frankenstein*

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____